AO 106A (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>iCloud account "c.weixeldorfer@gmail.com" | )<br>)<br>)<br>)<br>)<br>) |

Case No.  25-mj-04971

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960 | Importation of a Controlled Substance |
| 21 USC 841, 846 | Distribution of Controlled Substances and Conspiracy |

The application is based on these facts:

See attached affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Gabriela A. Nicasio*
_____
*Applicant's signature*

TFO Gabriela Nicasio
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date:  _____ 09/19/2025 _____

_____
*Judge's signature*

City and state:  San Diego, CA

Hon. Michael S. Berg, United States Magistrate Judge
_____
*Printed name and title*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT A-1

### Property to Be Searched

This warrant applies to information associated with iCloud account "c.weixeldorfer@gmail.com" used by Catherine WEIXELDORFER (Target Account 1), that is stored at premises owned, maintained, or operated by Apple Inc., an Internet Service Provider headquartered at One Apple Park Way, Cupertino, California, 95014.

18

## ATTACHMENT B-1

**I.**    Service of Warrant

The officer executing the warrant shall permit Apple Inc. (the ISP), as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II.**    Items subject to seizure from the ISP

    a.    All subscriber and/or user information, all electronic mail, files, cloud storage, location information, search history, images, text messages, voicemail, histories, buddy or friend lists, contacts, iCloud Drives, iCloud files, iCloud Backup and Restore, photos, notes, videos, calendars, messages profiles, methods of payment, detailed billing records, access logs, transactional data and any other files or records for Apple ID/iCloud account:

**c.weixeldorfer@gmail.com**

**III.**    The search of the data supplied by the ISPs pursuant to this warrant will be conducted by the Homeland Security Investigations as provided in the "Procedures For Electronically-Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to evidence of violations of 21 U.S.C. Sections 952, 960, 963, 841, and 846 for the period of January 23, 2025, up to and including March 23, 2025, and to seizure of:

    a.    Communications, records, attachments, files, and data tending to discuss or suggest efforts to import methamphetamine or other federally controlled substance from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

    b.    Communications, records, attachments, files, and data tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of federally controlled substances from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

20

c.    Communications, records, attachments, files, and data tending to identify co-conspirators, criminal associates, or others involved in importation of federally controlled substances from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

d.    Communications, records, attachments, files, and data tending to identify travel to or presence at locations involved in the importation of federally controlled substances from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substance within the United States, such as stash houses, load houses, or delivery points; and

e.    Communications, records, attachments, files, and data tending to identify the user(s) of the subject accounts, and any co-conspirators involved in the activities in III(a)-(d) above;

f.    Communications, records, attachments, files, and data that provide context to any communications or records described above, such as messages sent or received in temporal proximity to any relevant electronic communications and any electronic communications tending to identify users of the subject accounts;

**which are evidence of violations of Title 21 U.S.C. §§ 952, 960, 963, 841, and 846 (conspiracy to import and importation of controlled substances; conspiracy to distribute and distribution of controlled substances).**

21

## **AFFIDAVIT**

I, Gabriela Nicasio, being duly sworn, declare and state as follows:

### **INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for search warrants for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Apple Inc. ("Apple"), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California.   The information to be searched is described in the following paragraphs and in Attachments A-1 through A-2, as follows:

- iCloud account "c.weixeldorfer@gmail.com" used by Catherine Ann WEIXELDORFER (Target Account 1);

- iCloud account "c.west1124@gmail.com" used by Catherine Ann WEIXELDORFER (Target Account 2, collectively the Target Accounts);

This affidavit is made in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information (including the contents of communications) further described in Section II of Attachments B-1 through B-2. Upon receipt of the information described in Section II of Attachments B-1 through B-2, government-authorized person will review that information to locate the items described in Section III of Attachments B-1 through B-2.

2.     The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; my review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for search warrants, it does not

set forth each and every fact that I or others have learned during the course of this investigation. All dates, times, and amounts discussed herein are approximate.

### EXPERIENCE AND TRAINING

3.     I have been employed by United States Customs and Border Protection since 2003 and am currently assigned to the San Ysidro Criminal Enforcement Unit. I graduated from the CBP Basic Academy at the Federal Law Enforcement Training Center in Glynco, Georgia. I am a Federal Law Enforcement within the meaning of the Rule of Criminal Procedure and have a Federal Law Enforcement Officer for twenty-two years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

4.     During my tenure as a CBP Officer, I have participated in the investigation of numerous cases involving the importation of narcotics into the United States from Mexico, which have resulted in drug seizures, search warrants, and indictments. I have also participated in the investigation of federal cases involving the exportation of weapons and bulk currency from the United States to Mexico

5.     My duties involved the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I have investigated cases related to narcotics trafficking and bulk currency smuggling with a focus on criminal organizations exploiting United States ports of entry in Southern California.

6.     I am currently working as a Homeland Security Investigations (HSI) Task Force Officer (TFO) assigned to the Cartel Investigations Team in San Diego, California. My duties as a TFO include investigating transnational criminal organizations involved in drug importation and distribution throughout the United States and federal money laundering violations. During the course of my training, investigations, and conversations

with other law enforcement personnel, I have gained a working knowledge of the operational habits of drug and bulk currency smuggling groups, in particular those who attempt to smuggle narcotics into the United States from Mexico and money couriers attempting to smuggling bulk currency through the Southern District of California into Mexico.

7.    I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry and then to further distribute the narcotics within the United States, including in the San Diego, California area. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States, and traffickers within the United States frequently communicate with each other regarding importation and distribution of narcotics. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States and further distribution thereof.

8.    Based on my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods utilized in narcotics trafficking operations and some of the unique trafficking patterns employed by narcotics

organizations. I know that drug traffickers often require the use of a telephone facility to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. I know that professional drug operations depend upon maintaining their extensive contacts. The telephone enables drug traffickers to maintain contact with associates, suppliers and customers. I also know that drug traffickers sometimes use fraudulent information, such as fictitious names and false addresses, to subscribe to communication facilities, especially cellular phones. Through these investigations, my training and experience, and my conversations with other law enforcement investigators, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics. I am also familiar with the methods employed by large-scale narcotics organizations in attempts to thwart detection by law enforcement including but not limited to the use of cellular telephone technology, counter surveillance techniques, false or fictitious identities and addresses, and coded communications. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including their methods of distribution, storage, and transportation of narcotics, their methods of collecting proceeds of narcotics trafficking, and their methods of laundering money to conceal the nature of the proceeds. Based on my training and experience, I know that drug trafficking at the retail level is largely a cash business. I know that drug traffickers often generate large amounts of unexplained wealth, and through financial transactions, attempt to conceal, disguise or legitimize unlawful proceeds, through domestic and international banks and their attendant services, and otherwise legitimate businesses which generate large quantities of currency. In addition, drug traffickers often use drug proceeds to purchase additional narcotics to perpetuate and promote the ongoing conspiracy. I know that drug traffickers often use cellphones to communicate with co-conspirators in furtherance of their money laundering activities.

4

During the course of my employment, I have also become familiar with the ordinary meaning of controlled substance slang and jargon, and with the methods of packaging, consuming and transferring of controlled substances. I am also familiar with the manners and techniques of traffickers in methamphetamine, cocaine, heroin, marijuana, and fentanyl as practiced locally, including the importation from Mexico.

9. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of drug trafficking investigations. Further, I have personal knowledge of the following facts, or have had them related to me by other agents involved in the investigation. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

10. Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachments A-1 through A-2 contains evidence of violations of Title 21, United States Code, Sections 952, 960, 963, 841, and 846 as described in Section III of Attachments B-1 through B-2.

## JURISDICTION

11. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

12. On March 23, 2025, at approximately 1:52 A.M., Catherine Ann WEIXELDORFER (WEIXELDORFER) entered the United States from Mexico in her vehicle at the Otay Mesa Port of Entry, San Diego, California. As WEIXELDORFER presented herself at the primary inspection booth, the Customs and Border Protection Officer (CBPO) received a computer-generated alert on WEIXELDORFER. A subsequent inspection of WEIXELDORFER's vehicle revealed approximately 46 total packages of

5

narcotics concealed in the spare tire and quarter panels of WEIXELDORFER's vehicle. 36 packages contained methamphetamine with a total approximate weight of 22.72 kilograms and 10 packages contained heroin with a total approximate weight of 5.36 kilograms.

13.    Post-arrest, WEIXELDORFER waived her *Miranda* rights and agreed to speak with investigators. WEIXELDORFER denied knowledge of the drugs concealed inside her vehicle and suggested they may have been planted when she left her vehicle parked in front of Blackie Echevarria's friend's house. WEIXELDORFER stated Blackie is her friend Nina's (who she identified as being Josephina Echeverria) brother. WEIXELDORFER stated Blackie told her to park her car at his friend's house for safety reasons.

14.    A federal search warrant to search WEIXELDORFER's cell phone was obtained. Cellebrite download of the cell phone contents was completed with partial results.

15.    During the review of the contents of WEIXELDORFER's cell phone partial download, it was observed that WEIXELDORFER had two Apple ID or iCloud accounts associated with that device: (1) c.weixeldorfer@gmailcom; and (2) c.west1124@gmail.com.

16.    As part of my investigation, I subpoenaed the phone calls WEIXELDORFER has made while in federal custody. On April 3, 2025, while WEIXELDORFER was speaking with her husband, Mark WEIXELDORFER (Mark), she said the following:

WEIXELDORFER:    "I wanted to give the password to T-Mobile"

WEIXELDORFER:    "It's my dads birthday"

Mark:    "which is what"

WEIXELDORFER:    "10540"

WEIXELDORFER:    "hey you know what else, don't go out shouting names and shit, but Nina's brother has $4,000 dollars of mine"

6

| | | |
|---|---|---|
| 1 | Mark: | "yea" |
| 2 | Mark: | "so who do I get, Nina to get it or what?" |
| 3 | WEIXELDORFER: | "you get Brandon to get ahold of Vanessa" |
| 4 | Mark: | "on Vanessa came by yesterday" |
| 5 | WEIXELDORFER: | "yea well tell her to get her dad and get that $4,000 dollars |
| 6 | | dollars" |
| 7 | Mark: | "ok alright." |
| 8 | WEIXELDORFER: | "ok, but um, yea, because, well I don't want to go into it, |
| 9 | | but her dad" |
| 10 | Mark: | "has got money?" |
| 11 | WEIXELDORFER: | "yea yea, and I need Mario's phone number, do you have |
| 12 | | it on you, you have it on you, if not…., will know how to |
| 13 | | get it" |
| 14 | Mark: | "just a second, uh, I got him under Ted" |
| 15 | WEIXELDORFER: | "how is Ted" |
| 16 | Mark: | "I haven't talked to him in a while" |
| 17 | | "6387986 and I call him Ted" |
| 18 | WEIXELDORFER: | "Everything is gonna be fine honey, I didn't nothing, |
| 19 | | everything is going to be fine, I didn't do nothing" |
| 20 | Mark: | "I know that's what you said, we're going to work |
| 21 | | through it" |
| 22 | WEIXELDORFER: | "it's just gonna take time and it's gonna cost us some |
| 23 | | money and" |
| 24 | Mark: | "I know I understand, I'm not not so um chipping that |
| 25 | | away" |
| 26 | WEIXELDORFER: | "Just make sure you get ahold of the phone company" |
| 27 | | |
| 28 | | |

17.    During the monitored phone conversation between WEIXELDORFER and Mark, WEIXELDORFER advised Mark not to go "shouting out names", suggesting awareness of potential monitoring. The directive appeared intentional, possibly to avoid detection or documentation of specific individuals. Furthermore, throughout the call, WEIXELDORFER referenced individuals with known ties to narcotics activity. WEIXELDORFER discussed Nina, who she previously identified as Josephina Echeverria. Josephina was previously convicted of Importation of Marijuana in 2009 (case 09-CR-4218-MMA) and Importation of Methamphetamine in 2015 (case 15-CR-2077-JM). WEIXELDORFER further claimed that Vanessa's (identified as Vanessa Echevarria) father owed her $4,000 dollars. Subsequent research confirmed that Vanessa's father, positively identified as Juan Enrique Echeverria based on Vanessa's passport application, has a documented history of arrests for possession with intent to distribute controlled substances and was previously deported following the arrest.

18.    Based upon my training and experience, and in conferring with other agents and law enforcement personnel, I have found that it is common for additional information to be found within the return of an iCloud warrant that was not available from a cellphone extraction download. In some cases, this is due to users deleting information from their phones but not from their iCloud account(s). In other cases, this has to do with the technical limitations of the software (such as Cellebrite) used to conduct forensic data extractions from cellular phones.

19.    Furthermore, based upon my experience investigating narcotics traffickers, I believe that WEIXELDORFER was using her iPhone to communicate with co-conspirators about drug smuggling activities before her arrest, and the **Target Accounts** are likely to contain records of those communications and other relevant information. Subscriber and/or user information, including: all electronic mail, files, cloud storage, location information, search history, images, text messages, voicemail, histories, buddy or friend lists, contacts, iCloud Drives, iCloud files, iCloud Backup and Restore, photos,

notes, videos, calendars, messages profiles, methods of payment, detailed billing records, access logs, and transactional data is likely to lead to the identification of co-conspirators and other evidence relevant to the charged offense. I further believe that evidence of drug trafficking (such as iMessages, text messages, and Facebook Messenger communications, photos, videos, locations, and contacts) may be stored in the **Target Accounts**. In my training and experience, narcotics traffickers may be involved in the planning and coordination of drug importation events in the days and weeks prior to such an event. Given the alleged importation offense which occurred on March 23, 2025, I am requesting account data for the **Target Accounts** for the period between January 23, 2025, and March 23, 2025.

20.    Additionally, it is believed that the records are still available to Apple as a request to preserve the information contained on the **Target Accounts** was made under 18 U.S.C. § 2703(f).

## INFORMATION REGARDING APPLE ID AND iCLOUD

21.    Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

22.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

- Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

- iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

9

- iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and can also be used to store iOS device backups and data associated with third-party apps.

- iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

- Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

- Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

- Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

- App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices,

10

or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

23.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

24.    An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

25.    Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

26.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

27.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

28.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and

other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

29.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

30.     For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

31.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of

who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

32.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

33.    Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

34.    Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

**PROCEDURES FOR ELECTRONICALLY-STORED INFORMATION**

35.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and

14

other information (including the content of communications and stored data) particularly described in Section II of Attachments B-1 through B-2. Upon receipt of the information described in Section II of Attachments B-1 through B-2, government-authorized persons will review that information to locate the items described in Section III of Attachments B-1 through B-2.

36.     Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The ISP's personnel are not. It would be inappropriate and impractical for federal agents to search the ISP's vast computer network for the relevant accounts and then to analyze the contents of those accounts on the ISP's premises. The impact on its business would be disruptive and severe.

37.     Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the subject ISP accounts, as described in Section II of Attachments B-1 through B-2. In order to accomplish the objective of the search warrant with a minimum of interference with the ISP's business activities, to protect the privacy of its subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, agents seek authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure. Those copies will be provided to me or to an authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Section III of Attachments B-1 through B-2. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

38.     Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software. It may also be time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in

15

its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang or typographical errors. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Attachments to electronic mail messages are often in proprietary formats that do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. Internet Service Providers like Microsoft and Google do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

39.    Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.  Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination of the ISP's records will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

40.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the subject account and any electronic communications sent or received in temporal proximity to incriminating messages that provide context to the incriminating communications.

41.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**CONCLUSION**

42.    Based on the foregoing, I request that the Court issue the proposed search warrants.

43.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of these warrants.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Gabriela A. Nicasio*

_____
Task Force Officer Gabriela Nicasio
CBP Enforcement Officer

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 19th day of _____September_____, 2025.

_____
The Honorable Michael S. Berg
United States Magistrate Judge